CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 0 8 2015

JULIA C/DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

AMINA AL-HABASHY,                          )
                                           )        Civil Action No. 7:13CV00459
        Plaintiff,                         )
                                           )        **MEMORANDUM OPINION**
v.                                         )
                                           )        Hon. Glen E. Conrad
COMMONWEALTH OF VIRGINIA                    )        Chief United States District Judge
DEPARTMENT OF JUVENILE                      )
JUSTICE, et al.,                           )
                                           )
        Defendants.                        )

This employment discrimination case is presently before the court on motions for summary

judgment filed by the Commonwealth of Virginia Department of Juvenile Justice and the City of

Roanoke.  For the reasons set forth below, the motions will be granted.

### Factual Background

The following facts are either undisputed or, where disputed, are presented in the light

most favorable to the plaintiff.  See Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (emphasizing

that courts must view the evidence on summary judgment in the light most favorable to the

nonmoving party).

Amina Al-Habashy is an African-American woman.  She has been a practicing Muslim

for approximately 30 years.  Consistent with her understanding of her Islamic faith's

requirements, Al-Habashy wears a headscarf, attends prayer services on Friday afternoons, and

avoids having physical contact with men with whom she is not related by blood or marriage.

From 1997 to September of 2012, Al-Habashy was employed by the City of Roanoke ("the

City") as a Program Coordinator.  The Program Coordinator position was one of two

grant-funded positions assigned to Court Service Unit A of Virginia's 23rd Judicial Circuit

("Court Service Unit 23-A"). In that position, Al-Habashy managed a caseload of juvenile offenders under the supervision of the Juvenile & Domestic Relations Court for the City of Roanoke. Although Al-Habashy's salary was paid by the City, her daily work activities were monitored by employees of the Virginia Department of Juvenile Justice ("DJJ"), pursuant to an agreement between the City and the Commonwealth of Virginia. Two of Al-Habashy's supervisors employed by the DJJ during the relevant time period were Rodney Hubbard, the Director of Court Service Unit 23-A, and Kimberly Doyle, a Probation Supervisor. Al-Habashy also reported to James O'Hare, a City employee who served as the Youth Care Administrator for Juvenile Justice Programs.

In 2009, Al-Habashy applied to work for the DJJ as a Probation Supervisor for Court Service Unit 23-A. Al-Habashy interviewed for the position, but did not progress beyond the initial interview. She subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Upon receiving a right-to-sue letter from the EEOC, Al-Habashy filed suit in this court against the DJJ under Title VII of the Civil Rights Act of 1964 ("Title VII"), alleging that the DJJ refused to grant her a second-round interview for the Probation Supervisor position due to her race and religion. That action remained pending from June 29, 2011 until February 28, 2012, when the DJJ was awarded summary judgment. See Al-Habashy v. Dep't of Juvenile Justice, No. 7:11CV00306, 2012 U.S. Dist. LEXIS 24869 (W.D. Va. Feb. 28, 2012) (Wilson, J.).

Al-Habashy claims that Hubbard, O'Hare, and Doyle took adverse employment actions against her in retaliation for her complaints of discrimination. The first action complained of by Al-Habashy occurred in the spring of 2011, when Hubbard asked her to assist O'Hare in reviewing applications for a job vacancy. The application review was conducted in O'Hare's office, where

2

he and Al-Habashy reviewed the applications on O'Hare's computer. During her deposition, Al-Habashy testified that O'Hare "took [the] notes that [she] had taken" once they completed the application review, and advised her "that he had to take those notes from [her] on the applicants." Docket No. 72-1 at 54.

Following the meeting, Al-Habashy sent Hubbard a memorandum in which she complained about the fact that O'Hare had taken her notes, and requested that she be permitted to review the job applications on her own computer. In a memorandum drafted in response, Hubbard advised Al-Habashy that the City had converted to an online application screening process, and that the DJJ would not permit the City's computer programs to be loaded onto its network. Hubbard noted that he had "spoken with the HR office" and "arranged for them to copy the applications for [her]" to review. Docket No. 70-2 at 24. To the extent that Al-Habashy took issue with O'Hare acquiring the handwritten notes that she had made during their meeting, Hubbard noted that he was "not aware of [her] being forbidden to take notes, but if that was an issue that arose during [her] work with Mr. O'Hare, [Hubbard] was certain that it was related to compliance with regulations and law." Id.

On July 27, 2011, Hubbard sent Al-Habashy a memorandum clarifying the process for receiving mileage reimbursement checks. Hubbard advised her that a mileage reimbursement voucher needed to be filed by the fifth day of each month, that the vouchers would be processed by the Court Service Unit's administrative staff, that they would then be sent to the Department of Finance, and that it could take a few weeks for checks to be issued by that department. Hubbard noted that Al-Habashy's recent interactions with employees of the Department of Finance had been perceived by the employees as being insensitive to their other work responsibilities. He requested that she refrain from having any direct contact with those employees regarding her

3

mileage reimbursement vouchers, and that she instead contact one of the designated DJJ staff members if more than two weeks elapsed after a voucher was submitted and she did not receive a reimbursement check.

After reviewing Al-Habashy's mileage expenditures for the 2011 fiscal year and for June and July of 2011, Hubbard sent Al-Habashy another memorandum on October 24, 2011. Hubbard noted that Al-Habashy's mileage reimbursements for the previous fiscal year had exceeded the amount budgeted by $827.00. He also noted that the reimbursements that she had already received during the 2012 fiscal year left her with a remaining budgeted balance of $564.31. Hubbard encouraged Al-Habashy to make use of state vehicles assigned to the Court Service Unit, and to take advantage of telecommunication opportunities when possible.

That same month, Al-Habashy applied for another Probation Supervisor position within Court Service Unit 23-A. Theresa Burton, a Caucasian female employed by the DJJ as the Human Resources Supervisor at Beaumont Correctional Center, served as the lead panel member responsible for screening the applications and serving as the interview chairperson. Upon completing the screening process, Burton selected seven of the twenty applicants to be interviewed for the position. Six of those applicants, including Al-Habashy, were interviewed on November 8, 2011. The interview panel consisted of Burton, Hubbard, and Robert Foster, a Caucasian male employed as the DJJ Regional Director for Southwest Virginia. Following the individual interviews, each applicant was given a written exercise to complete and return to the panel. According to Burton's sworn declaration and the accompanying interview evaluation worksheets, Al-Habashy was the only candidate who did not submit the written exercise.

4

The panel ultimately selected Kimberly Doyle, a Caucasian female, for the position. Doyle assumed the position of Probation Supervisor on December 10, 2011. In that position, Doyle served as Al-Habashy's immediate DJJ supervisor.

In the latter part of 2011, Al-Habashy began receiving treatment for depression and anxiety at Lewis-Gale Physicians, LLC. In January of 2012, Al-Habashy went on medical leave. She did not return to work until April 3, 2012. From April 3, 2012 until April 16, 2012, Al-Habashy worked half-days.

On April 20, 2012, one of Al-Habashy's juvenile clients was scheduled to appear in court for a review of previously ordered community service hours. Because documentation was lacking as to whether the juvenile had completed his community service hours and no one was present on behalf of the Court Service Unit, the presiding judge continued the matter until June 12, 2012 and requested an oral report and recommendation. Thereafter, Doyle sent Al-Habashy a note specifically requesting that she attend the next hearing. After speaking with Hubbard, however, Al-Habashy elected not to attend the hearing, since a probation officer assigned to the case was going to be present.

Doyle subsequently drafted a written reprimand for insubordination and submitted it to Hubbard for review. Hubbard changed the reprimand to a counseling memorandum, which Doyle issued on July 9, 2012. In the memorandum, Doyle noted that Al-Habashy's failure to follow Doyle's specific instructions could be "interpreted as being non-compliant and insubordinate and could potentially subject [her] to corrective action." Docket No. 70-3 at 24. In a subsequent letter, Hubbard denied Al-Habashy's request to have the counseling memorandum removed from her file. Hubbard emphasized that the counseling memorandum was not a formal disciplinary measure, and that it was instead "written to clearly establish that actions, such as

5

refusing to follow the direct requests of your supervisor, could be construed as insubordination and could lead to formal disciplinary action." Docket No. 70-3 at 25.

Al-Habashy was on medical leave again from June 28, 2012 until July 16, 2012. On July 24, 2012, Al-Habashy sent Doyle an email advising that she would be working half-days "per [her] doctor's instructions this week and the next week," and that she was "anticipating a separation shortly thereafter." Docket No. 70-2 at 26. That same day, Al-Habashy sent a letter to Angelia Vernon, a Human Resources Consultant for the City, in which she indicated that she was in the process of applying for long-term disability insurance benefits, that her last day of work would be Friday, August 3, 2012, and that she did not have a return date. Docket No. 72-6.

On July 30, 2012, Al-Habashy sent Doyle another email, on which Hubbard and O'Hare were copied. In the email, Al-Habashy stated, in pertinent part, as follows:

> My doctor's notes are delivered directly to Human Resources. You can speak with our HR manager regarding my status. I understand that this information is confidential and protected information. HR will verify that this Friday, August 3, 2012 will be my last day.

Docket No. 72-5.

Doyle construed the July 30, 2012 email as a notice of resignation. That same day, Doyle sent Al-Habashy a letter accepting her resignation. The letter was also signed by Hubbard.

Al-Habashy subsequently provided a doctor's note that was issued on July 24, 2012. The note requested that she be allowed to work half-days from July 23, 2012 to August 3, 2012 for "medically necessary reasons." Docket No. 72-8. The doctor's note did not indicate that Al-Habashy would need to be on medical leave after August 3, 2012.

Al-Habashy last worked on Sunday, August 5, 2012. She did not return to work after that day or provide a date on which she would return to work. On the day Al-Habashy last appeared for work, she had already exhausted the medical leave to which she was entitled under the Family

6

and Medical Leave Act ("FMLA"). By the middle of August, Al-Habashy exhausted all of her other leave balances.

The City's evidence indicates that O'Hare attempted to reach Al-Habashy by telephone on several occasions after August 4, 2012 to determine when she might be able to return to work, and that Al-Habashy did not return his phone calls. While Al-Habashy denies receiving any voicemail messages from O'Hare, it is undisputed that she did not advise him or any other supervisor as to when she could be expected to return to work.

On August 29, 2012, O'Hare issued Al-Habashy a Notice of Proposed Dismissal. The Notice advised Al-Habashy that O'Hare intended to dismiss her from her employment with the City, and that the effective date of the proposed dismissal was September 5, 2012. In the Notice, O'Hare emphasized that Al-Habashy had exhausted all of her FMLA leave, that there was no indication that she would be returning to work at any time in the near future, and that it was "necessary for the proper operations of the Division of Juvenile Justice Services that [her] position be filled immediately." Docket No. 72-2 at 8. O'Hare advised Al-Habashy that she had the right to respond within two days of her receipt of the Notice of Proposed Dismissal and that she had the right to request a hearing.

After receiving no response within the time allotted, O'Hare issued a Notice of Dismissal on September 5, 2012. The Notice of Dismissal advised Al-Habashy of her right to grieve the dismissal pursuant to the City's grievance procedure.

Al-Habashy subsequently filed a grievance challenging her termination. She eventually received a hearing before the Personnel Employment Practices Commission ("PEPC"). Based on the evidence presented at the hearing, the PEPC found (1) that Al-Habashy failed to prove that she

7

was subjected to a hostile work environment, and (2) that she never provided a return-to-work date.

Al-Habashy has submitted a sworn declaration in which she indicates that she "believes that she worked approximately 6 hours of overtime a week, including weekends, except when she was on vacation." Docket No. 75-20. During her deposition, Al-Habashy testified that she was told that she could not be paid for overtime hours, and that she instead accrued and used compensatory time for overtime hours that she worked. Docket No. 72-1 at 117.

According to declarations filed by the City, Al-Habashy's use of compensatory time "was common and was documented on her weekly timesheets." Supp'l Decl. of Cathy Plunket, Docket No. 72-12; see also Decl. of Andrew Harmon, Docket No. 72-13. Andrew Harmon, the Municipal Auditor for the City of Roanoke, was asked to audit Al-Habashy's timesheets and leave records from June 29, 2010 through August 6, 2012. Based on his review of the records, Harmon determined that the City compensated Al-Habashy for all overtime hours worked by allowing her to accumulate and utilize compensatory time. In analyzing the records, Harmon credited Al-Habashy compensatory time at a rate of one and one-half hours for each hour of overtime worked. He ultimately determined that the City overpaid Al-Habashy by $786.00 during the relevant time period.

### Procedural History

On September 27, 2013, Al-Habashy filed the instant action against the DJJ, the City, Hubbard, Doyle, and O'Hare. On March 12, 2014, she was granted leave to file an amended complaint. All five defendants then moved to dismiss portions of the amended complaint. The court held a hearing on the motions on May 19, 2014. Following the hearing, the court entered an order permitting Al-Habashy to file a second amended complaint.

8

Al-Habashy filed the second amended complaint on June 16, 2014, in which she asserted the following claims: retaliation in violation of Title VII against the DJJ and the City of Roanoke (Count I); discrimination on account of race and religion in violation of Title VII against the DJJ (Count II); discrimination on account of age in violation of the Age Discrimination in Employment Act ("ADEA") against the DJJ (Count III); harassment on account of race and religion in violation of Title VII against the DJJ and the City of Roanoke (Count IV); discrimination in violation of the Americans with Disabilities Act against the City (Count V); violations of her First Amendment right to free speech and her Fourteenth Amendment right to due process pursuant to 42 U.S.C. § 1983 against Hubbard, Doyle, and O'Hare (Count VI); race discrimination in violation of 42 U.S.C. §§ 1981 and 1983 against the DJJ, the City, Hubbard, Doyle, and O'Hare (Count VII); violations of the Fair Labor Standards Act ("FLSA") against the City of Roanoke (Count VIII); and intentional interference with employment against the DJJ, Hubbard, and Doyle (Count IX).

The DJJ, Hubbard, and Doyle moved for partial dismissal of the second amended complaint. On September 24, 2014, the motion was granted in part and denied in part. The court dismissed the age discrimination claim against the DJJ; the religiously hostile work environment claim against the DJJ; the due process claim against Hubbard and Doyle; the First Amendment claim against Hubbard and Doyle; and the claim of race discrimination under §§ 1981 and 1983 asserted against the DJJ, and Hubbard and Doyle in their official capacities.

Hubbard passed away in 2014. On September 10, 2015, the court dismissed the remaining claims against Hubbard, pursuant to Rule 25(a) of the Federal Rules of Civil Procedure, based on the plaintiff's failure to timely substitute the appropriate party following Hubbard's death. The court also dismissed the remaining claims against Doyle and O'Hare, after receiving a stipulation of dismissal from the plaintiff with respect to these two defendants.

The case is now before the court on motions for summary judgment filed by the DJJ and the City. In response to the motions, Al-Habashy has abandoned the hostile work environment claim; the claim against the City under §§ 1981 and 1983; and the state tort claim. Accordingly, the following claims remain: the claims for retaliation in violation of Title VII against the DJJ and the City (Count I); the claims for discrimination on account of race and religion in violation of Title VII against the DJJ (Count II); the claim for discrimination in violation of the ADA against the City (Count V); and the FLSA claim against the City (Count VIII).

The court held a hearing on the motions for summary judgment on September 30, 2015. The motions have been fully briefed and are ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. Tolan, 134 S. Ct. at 1866. To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co.,

312 F.3d 645, 649 (4th Cir. 2002) (quoting <u>Phillips v. CSX Transp., Inc.</u>, 190 F.3d 285, 287 (4th Cir. 1999)).

**Discussion**

**I.      Title VII Retaliation Claim**

In Count I, Al-Habashy claims that the DJJ and the City violated Title VII by retaliating against her because of her complaints of discrimination.    In addition to prohibiting discrimination on the basis of a protected trait, Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the statute.    <u>See</u> 42 U.S.C. § 2000e-3(a).    When there is no direct evidence of retaliation, a plaintiff may proceed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1983).    <u>See Price v. Thompson</u>, 380 F.3d 209, 212 (4th Cir. 2004).    This framework requires the plaintiff to initially establish the following elements by a preponderance of the evidence: (1) that she engaged in a statutorily protected activity;  (2) that she suffered an adverse action; and  (3) that a causal connection existed between the protected activity and the adverse action.    <u>EEOC v. Navy Fed. Credit Union</u>, 424 F.3d 397, 405-06 (4th Cir. 2005).

The first element of the prima facie case requires the plaintiff to prove that she participated in a protected activity under the retaliation provisions of Title VII.    The retaliation provisions of Title VII include both an opposition clause and a participation clause.    <u>Kubicko v. Ogden Logistics Servs.</u>, 181 F.3d 544, 551 (4th Cir. 1999).    The opposition clause makes it unlawful for an employer to retaliate against an individual because she "opposed any practice" made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."    <u>Id.</u> (quoting 42 U.S.C. § 2000e-3(a)).

11

The second element of the prima facie case requires the plaintiff to prove that she suffered an adverse action. For an action to qualify as an adverse action under the anti-retaliation provision of Title VII, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted). Although a materially adverse action is not limited to one that affects the terms and conditions of employment, "petty slights, minor annoyances, and simple lack of good manners" are insufficient to support a retaliation claim. Id.

The third element requires the plaintiff to establish that a causal relationship existed between the protected activity and the adverse action. This burden, at the prima facie stage, can be satisfied by the temporal proximity between protected activity and an adverse action. See Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 253 (4th Cir. 2015) (finding that a one-month gap between the plaintiff's complaints of retaliation and her termination tended to show causation).

When a plaintiff establishes the foregoing elements, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for its purportedly retaliatory action. Id. at 250. If the defendant makes this showing, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc). "In order to carry this burden, a plaintiff must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" Id. at 252 (alterations in original) (quoting Jiminez v.

Mary Washington Coll., 57 F.3d 369, 378 (4th Cir. 1995)). In other words, the plaintiff must prove that retaliation was the "but-for cause" of the challenged adverse action. Id.

Having summarized the applicable legal standards for evaluating a Title VII retaliation claim, the court turns to the claim asserted in the instant case. Specifically, Al-Habashy claims that the DJJ and the City took adverse employment actions against her in retaliation for filing a charge of discrimination with the EEOC in 2009 and a subsequent lawsuit against the DJJ in June of 2011. In her brief in opposition to the pending motions, Al-Habashy argues that she suffered retaliatory actions when (1) O'Hare took the notes that she made during their joint review of applications for a vacant position with the City of Roanoke in the spring of 2011; (2) Hubbard advised her that the DJJ would not allow the City's computer programs to be loaded onto its network; (3) Hubbard denied her request for reimbursement of the costs incurred in attending a training course; (4) Hubbard scrutinized her requests for mileage reimbursement; (5) Doyle, with Hubbard's approval, issued a counseling memorandum that was placed in Al-Habashy's personnel file; and (6) the City terminated her employment.

As an initial matter, the court concludes that no reasonable jury could find that certain actions enumerated above rose to the level of a "materially adverse" action. Burlington N., 548 U.S. at 68. Specifically, the court concludes that the mere fact that, on one occasion, O'Hare retrieved the notes that Al-Habashy made during their review of job applications would not dissuade a reasonable employee from participating in protected conduct. Likewise, the court is convinced that Hubbard's memorandum advising Al-Habashy that the DJJ would not allow the City's computer programs to be loaded onto to its network would not dissuade a reasonable employee from engaging in protected activity, nor would his memoranda regarding Al-Habashy's requests for mileage reimbursement and the procedures applicable to such requests. See, e.g.,

Wells v. Gates, 336 F. App'x 378, 383 (4th Cir. 2009) (holding that a letter requesting further documentation to substantiate the plaintiff's medical condition, which also indicated that the plaintiff had already missed a certain number of days and cautioned that no further sick leave could be granted without the requested documentation, was not a materially adverse action).

The court will assume, for purposes of the pending motions, that Al-Habashy can establish a prima facie case of retaliation with respect to the remaining employment actions. For the following reasons, however, the court concludes that she has failed to proffer sufficient evidence to establish that the articulated reasons for the actions were false and that retaliation was the real reason for the challenged conduct. See Foster, 787 F.3d at 252.

## A.     Denial of request for reimbursement for training course costs

In June of 2012, Al-Habashy submitted a request for reimbursement of the costs incurred in attending a training course. On July 10, 2012, Hubbard issued a memorandum denying the request. In the memorandum, Hubbard advised Al-Habashy that the "closest policy that [he] was able to locate in reference to this request [was] the City's policy governing its Tuition Assistance Program," and that the policy "advises that application for tuition assistance shall be made by the employee prior to the start of the training course." Docket No. 70-2 at 18. Hubbard emphasized that he and Al-Habashy had not had such prior discussions regarding the seminar that she attended, and that she had also failed to provide sufficient information to establish that the course would improve her job performance.

The DJJ has clearly met its burden of demonstrating a legitimate, nonretaliatory reason for the denial of Al-Habashy's request for training reimbursement. In her response to the pending motions, Al-Habashy does not cite to any evidence from which a reasonable jury could find that the proffered reason was pretext for unlawful retaliation. In the absence of such evidence,

14

the court concludes that the DJJ is entitled to summary judgment on this portion of Al-Habashy's retaliation claim.

**B.    Counseling memorandum**

Al-Habashy also claims that she was disciplined by Doyle in retaliation for engaging in protected activity.    As summarized above, Doyle issued a counseling memorandum to Al-Habashy on July 9, 2012, after Al-Habashy failed to attend a court hearing that had been rescheduled at the behest of the presiding judge.    Although Doyle specifically requested in writing that Al-Habashy attend the hearing, Al-Habashy elected not to do so since a probation officer was already planning to attend.    In the counseling memorandum, Doyle noted that Al-Habashy's response to her request "c[ould] be interpreted as being non-compliant and insubordinate and could potentially subject her to corrective action."    Docket No. 70-3 at 24.

The DJJ has met its burden of demonstrating a legitimate, nonretaliatory reason for the counseling memorandum.    In response, Al-Habashy merely argues that she spoke to Hubbard before the court hearing, and that he agreed that she did not need to attend, since a probation officer was going to be present.    This argument, however, misconstrues Al-Habashy's burden.    In assessing whether an employer's proffered reason is pretextual, "it is the perception of the decisionmaker which is relevant."    Holland v. Wash. Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007) (internal citation and quotation marks omitted).    When an employer articulates a legitimate, nonretaliatory reason for an employment action, this court does not "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [action]."    Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000)).    In this case, it is undisputed that Doyle, Al-Habashy's immediate supervisor, specifically instructed Al-Habashy to attend the court hearing, and that Al-Habashy affirmatively disregarded Doyle's instruction.    Regardless of

15

whether Hubbard agreed with Al-Habashy that it was unnecessary for her appear for the hearing, Al-Habashy has failed to proffer any evidence from which a reasonable jury could find that Doyle did not honestly believe that Al-Habashy's noncompliance with her express instruction could be interpreted as being insubordinate, and that such conduct warranted a counseling memorandum. Accordingly, the DJJ's motion for summary judgment will be granted with respect to this claim.

### C.    Termination

In the final component of her retaliation claim, Al-Habashy alleges that the City terminated her employment in retaliation for engaging in protected activity.   The City has articulated a legitimate, nonretaliatory reason for terminating her employment.    Specifically, the City maintains that Al-Habashy was terminated after she stopped coming to work and provided no anticipated date upon which she would return.   Because the City has clearly met its burden of proffering a nonretaliatory basis for its termination decision, Al-Habashy must show that the asserted basis is pretext for retaliation.   For the following reasons, the court concludes that she has failed to create a genuine issue of material fact with respect to this issue.

In her affidavit submitted in opposition to the pending motions, Al-Habashy asserts that she never received any voicemail messages from O'Hare between her last day of work and the date on which she received his Notice of Proposed Termination.    To the extent Al-Habashy suggests that her sworn statement in this regard is sufficient to establish pretext, the court disagrees.   It is undisputed that Al-Habashy advised the City, in writing, that her last day of work would be August 3, 2012, and that she did not have a return date.   It is also undisputed that Al-Habashy never provided a date by which she anticipated that she would return to work.   It was not until after she failed to report to work for more than thirty days without providing an expected return-to-work date that the City terminated her employment.   On this record, even if Al-Habashy did not receive

16

any voicemail messages from O'Hare, which the court assumes is true for purposes of the City's motion, no reasonable jury could find that the proffered basis for her termination is "unworthy of credence." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 143 (2000).

Additionally, Al-Habashy has failed to identify any similarly situated employee who was treated differently by the City. See, e.g., Laing v. Fed. Express Corp., 703 F.3d 713, 719 (4th Cir. 2013) (noting that federal courts "routinely rely on comparator evidence when deciding whether an adverse employment action was driven by a discriminatory motive"). While she summarily argues in her brief in opposition to the pending motions that the City had a "practice . . . of holding employment for employees in [her] position," Docket No. 75 at 21, she cites no evidence to support this assertion. Moreover, when questioned during her deposition, Al-Habashy was unable to identify any similarly situated employee whose job was protected while the employee went out on indefinite leave. See Docket No. 72-1 at 114-15. Al-Habashy's unsupported assertion regarding the City's treatment of other employees is insufficient to establish that the asserted basis for her termination was pretext for retaliation. See, e.g., Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1985) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.").

For these reasons, the court concludes that Al-Habashy has failed to create a genuine issue of material fact as to whether the City terminated her employment because of her previous complaints of discrimination. Accordingly, the City's motion for summary judgment will be granted with respect to this claim.

17

## II.     Title VII Discrimination Claim

In Count II of the second amended complaint, Al-Habashy claims that the DJJ discriminated against her on account of her race and religion, when it failed to select her for the Probation Supervisor position that she applied for in 2011.   See 2d Am. Compl. ¶¶ 94-102.   Title VII prohibits an employer from "fail[ing] or refus[ing] to hire . . . or otherwise . . . discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] religion . . . ."   42 U.S.C. § 2000e-2(a).   A plaintiff can establish a claim of discriminatory failure to hire by providing direct evidence of discrimination or by proceeding under the burden-shifting framework established in McDonnell Douglas.   A plaintiff provides direct evidence by demonstrating that race or religion was "a motivating factor" in the employer's adverse employment decision.   Adams v. Trs. of the Univ. of N. Carolina-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011) (internal quotation marks omitted). Such proof includes "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."   Hill, 354 F.3d at 284 (internal citation and quotation marks omitted).

Under the McDonnell Douglas burden-shifting framework, a plaintiff can establish a prima face case of discriminatory failure to hire by showing: (1) that she is a member of a protected class; (2) that she applied for the position in question; (3) that she was qualified for the position; and (4) that the DJJ rejected her application under circumstances giving rise to an inference of discrimination.   Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005).   If the defendant provides evidence of a nondiscriminatory reason for the hiring decision, the presumption of discrimination is rebutted, and the plaintiff must demonstrate that the proffered reason was pretext for discrimination.   Id.

18

**A.     Race discrimination**

Having reviewed the record in the light most favorable to Al-Habashy, the court concludes that she has failed to meet her burden of establishing a viable claim of race discrimination under either method of proof.   In her brief in opposition to the pending motions, Al-Habashy concedes that there is "no direct evidence of racial bias against [her]."   Docket No. 75 at 15.   Additionally, even assuming that Al-Habashy can satisfy every element of the prima facie case required under the McDonnell Douglas framework, she has not demonstrated that the DJJ's legitimate, nondiscriminatory reasons for failing to select her for the Probation Supervisor position were pretext for race discrimination.

As explained above, once a plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Hill, 354 F.3d at 285.   In this case, the DJJ maintains that Al-Habashy was not selected for her position based on her responses to the questions posed during the interview and her failure to complete the written exercise distributed to each of the candidates interviewed.   Because the DJJ has clearly met its burden of articulating   legitimate, nondiscriminatory reasons for the hiring decision, "the burden shifts back to [the plaintiff] to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Reeves, 530 U.S. at 143).   While Al-Habashy advances several arguments in an attempt to establish pretext, the court concludes that she has failed to carry her burden.

Al-Habashy first suggests that she was better qualified than Doyle for the Probation Supervisor position, based on her educational background and years of experience with the Court Service Unit.   While a plaintiff alleging a failure to hire "can prove pretext by showing that [she]

19

was better qualified," Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 259 (4th Cir. 2006), she "cannot establish her own criteria for judging her qualifications for the [position]" but "must compete for the [position] based on the qualifications established by [the] employer." Anderson, 406 F.3d at 269. In this case, there is no evidence that educational background or experience was a deciding factor in the interview process. Instead, the interview evaluation worksheets and the declaration of Theresa Burton indicate that the interview panel based their decision on the responses to the questions asked of each candidate during the interview and the written exercise. Consequently, while Al-Habashy may believe that she was more qualified for the position based on her education and experience, her "self-assessment of [her] superior aptitude for the position fails to rebut the [defendant's] legitimate explanation." Moore v. Mukasey, 305 F. App'x 111, 117 (4th Cir. 2008).

In her brief in opposition to the pending motions, Al-Habashy also emphasizes that she previously overheard Hubbard, who himself was African-American, "express a biased viewpoint in conversation [about] black people." Docket No. 75 at 16. She cites to portions of her deposition testimony, during which she described a conversation that occurred on one occasion. During that conversation, Hubbard purportedly indicated that his "neighbors" had been talking about him after he purchased a new vehicle, and that whenever he saw the neighbors, they were "just sitting around not doing anything, and then they think that they should have something." Docket No. 72-1 at 37-38.

At this stage of the proceedings, the court accepts as true Al-Habashy's account of Hubbard's comments. However, even assuming that such statements were made by Hubbard, they are not probative of a racially discriminatory animus. There is no evidence that Hubbard was referring to African-Americans when he commented about his "neighbors" on this one occasion.

20

Even if the neighbors to which he was referring were African-American, his comments do not reflect any racially discriminatory attitude. Moreover, Al-Habashy acknowledged during her deposition that DJJ supervisors never made any comments directly to her regarding race, and that she never saw any negative comments written by DJJ supervisors regarding African-Americans. On this record, the statements that Al-Habashy overheard on one occasion pertaining to Hubbard's neighbors are clearly insufficient to establish that the asserted reasons for the interview panel's hiring decision were pretext for race discrimination.

Finally, Al-Habashy's counsel argued for the first time during the hearing on the instant motions that she disputes the assertion that she did not complete the written exercise that the candidates were asked to complete. This argument is deficient for a number of reasons. First, it is unsupported by the record. When asked during her deposition if the interview process included a written assignment, Al-Habashy testified that she "d[id not] remember." Docket No. 72-1 at 34. She then acknowledged that her interview evaluation form indicated that the written assignment was "not completed." Id. At no point, during her deposition or in her subsequent declaration, did Al-Habashy suggest that she did, in fact, complete the written assignment.

Additionally, Al-Habashy has presented no evidence from which a reasonable jury could find that the DJJ interview panel did not honestly believe that Al-Habashy failed to submit the written assignment. See Holland, 487 F.3d at 217 (emphasizing that "it is the perception of the decisionmaker which is relevant"). Al-Habashy's counsel acknowledged during the hearing that the DJJ's files contain no written assignment from her. This is consistent with the interview evaluation worksheet completed by the panel, as well as Burton's sworn declaration. On this record, plaintiff's unsupported efforts to dispute whether she actually completed the written

exercise are insufficient to raise a triable issue of fact as to the truth of the DJJ's asserted grounds for not selecting her for the Probation Supervisor position.

For all of these reasons, the court concludes that Al-Habashy's evidence fails to create a genuine issue of material fact as to whether the DJJ failed to select her for the Probation Supervisor position because of her race. Accordingly, the DJJ's motion for summary judgment will be granted with respect to this claim.

### B. Religious Discrimination

The court likewise concludes that Al-Habashy has failed to meet her burden of establishing a viable claim of religious discrimination. She has not proffered any direct evidence that her religious beliefs were a motivating factor in the decision not to select her for the Probation Supervisor position. Additionally, she has failed to proffer sufficient evidence to establish that the DJJ's legitimate, nondiscriminatory reasons for the hiring decision were pretext for religious discrimination.

In her brief in opposition to the pending motions, Al-Habashy focuses primarily on evidence demonstrating that the members of the interview panel knew that she is a practicing Muslim. Al-Habashy emphasizes that Hubbard was aware of her religious beliefs from having supervised her in her existing position, and that the traditional Muslim attire that she wore for her interview would have also put the other two members of the panel on notice of her religion. However, the mere fact that the interview panel knew that Al-Habashy is a practicing Muslim is inadequate as a matter of law to attribute their hiring decision to religion. In order to prevail on her claim of discrimination under Title VII, the plaintiff is required to show "that she was not promoted because of her [membership in a protected class], not that she was a member of [a protected class] and was not promoted." Autry v. N.C. Dep't of Human Res., 820 F.2d 1384,

1386 (4th Cir. 1987) (emphasis in original). Additionally, the mere fact that Al-Habashy is unaware of any Muslim candidates who have been hired to fill a supervisory position within the 23rd Circuit is insufficient to establish that the asserted reasons for not selecting her for the Probation Supervisor position were pretext for religious discrimination.

For these reasons, the court concludes that Al-Habashy has failed to proffer sufficient evidence to avoid summary judgment on her claim of religious discrimination under Title VII. Accordingly, the DJJ's motion will be granted with respect to this claim.

### III.   **ADA Discrimination Claim**

In Count V of the second amended complaint, Al-Habashy claims that the City terminated her employment on the basis of her disability, in violation of the ADA. She also claims that the City violated the ADA by failing to provide her with a reasonable accommodation for her disability. The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Such unlawful discrimination includes not only disparate treatment because of an employee's disability, but also the "failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" Wilson v. Dollar Gen. Corp., 717 F.3d 337, 344 (4th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)).

### A.   **Discriminatory Discharge**

In the absence of direct evidence of discrimination, claims of discriminatory discharge under the ADA are evaluated under the McDonnell Douglas burden-shifting framework. See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-58 (4th Cir. 1995) (extending the McDonnell Douglas burden-shifting scheme to ADA cases). Thus, if Al-Habashy puts forth

sufficient evidence to establish a prima facie case of discrimination and the City offers a legitimate, nondiscriminatory explanation for its employment decision, Al-Habashy bears the burden of establishing that the employer's proffered explanation is pretext for disability discrimination. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 575-76 (4th Cir. 2015).

The court will assume, for purposes of the pending motions, that Al-Habashy can establish every element of the required prima facie case. As discussed above, however, the City has presented evidence demonstrating that she was terminated because she stopped coming to work and failed to provide any anticipated date upon which she would return. In the absence of any evidence that would create a genuine issue of material fact regarding the legitimacy of the City's decision, the court concludes that the City is entitled to summary judgment on her discriminatory discharge claim under the ADA.

## B. Failure to Accommodate

The court likewise concludes that the City is entitled to summary judgment on Al-Habashy's claim that it failed to accommodate her disability. To the extent Al-Habashy contends that the City should have accommodated her disability by permitting her to remain on leave indefinitely, she has failed to establish that such an accommodation, if requested, would have been reasonable. See Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995) (holding that "reasonable accommodation does not require the [employer] to wait indefinitely for [an employee's] medical conditions to be corrected"); see also Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003) (holding, as a matter of law, that the plaintiff's requested accommodation of indefinite leave was not reasonable); Hudson v. MCI Telecomms. Corp., 87 F.3d 1167, 1169 (10th Cir. 1996) (noting that the plaintiff must present evidence of the impairment's expected duration in order for a

24

requested accommodation to be reasonable).   Accordingly, the court will grant the City's motion with respect to this claim.

## IV.   **FLSA Claim**

In the final count, Al-Habashy claims that the City "failed to pay [her] overtime for hours worked in excess of 40 hours per week," in violation of the FLSA.   2d Am. Compl. ¶ 151.   In moving for summary judgment on this claim, the City concedes that it did not pay Al-Habashy for any overtime worked.   Instead, the City argues that it fully compensated her for the extra hours worked by allowing her to utilize compensatory time.

The FLSA generally requires employers to pay their employees for overtime work at a rate of one and one-half times the employees' regular wages.   29 U.S.C. § 207.   In 1985, Congress amended the FLSA to provide an exception to this rule for governmental agencies.   Moreau v. Klevenhagan, 508 U.S. 22, 24 (1993).   Under the amendments, "public employers may compensate employees who work overtime with extra time off instead of overtime in certain circumstances."   Id. (citing 29 U.S.C. § 207(o)).   As relevant in the instant case, public employees may receive, in lieu of overtime compensation, compensatory time off at a rate of not less than one and one-half hours for each hour of work for which overtime compensation is required, if there is "an agreement or understanding arrived at between the employer and employee before the performance of the work."   29 U.S.C. § 207(o)(2).   "Such an agreement or understanding need not be formally reached and memorialized in writing, but instead can be arrived at informally, such as when an employee works overtime knowing that the employer rewards overtime with compensation time."   Christensen v. Harris Cty., 529 U.S. 576, 579 n.1 (2000).

In this case, the City has proffered a declaration from Cathy Plunkett, the Office Services Supervisor for the Court Service Unit, which indicates that Al-Habashy "was allowed to accumulate and use compensatory time for any overtime hours that she worked," and that Al-Habashy's use of compensatory time "was common and was documented on her weekly timesheets." Docket No. 72-12. The City has also submitted a declaration from Andrew Harmon, the Muncipal Auditor for the City of Roanoke, who reviewed Al-Habashy's timesheets and leave records from June 29, 2010 through August 6, 2012. According to Harmon's declaration, Al-Habashy's timesheets confirm that she routinely accrued and utilized compensatory time for overtime hours that she worked, and that the City more than adequately compensated her for all of her time.

During the hearing on pending motions, Al-Habashy argued that she was not fully compensated for all of her overtime hours. However, she has not proffered any evidence from which a reasonable jury could find in her favor on this issue. While Al-Habashy submitted an affidavit indicating that she "believes she worked approximately 6 hours of overtime a week, including weekends, except when she was on vacation," her affidavit does not address, much less rebut, the evidence indicating that she received compensatory time for the extra hours that she worked. Docket No. 75-20. Moreover, Al-Habashy acknowledged during her deposition that she was allowed to take compensatory time after working overtime, and that she did, in fact, take advantage of this arrangement during the course of her employment. See Docket No. 72-1 at 117-18. While Al-Habashy may have preferred receiving monetary compensation for overtime hours instead of compensatory time, she "cannot now be heard to complain of a legal condition of employment, which [she] accepted . . . implicitly by continuing [her] employment." White v. Denton County, No. 4:13CV13, 2015 U.S. Dist. LEXIS 129907, at *4 (E.D. Tex. Sept. 28, 2015)

26

(holding that the public employee's FLSA claim failed as a matter of law); see also Holb v. City of Beaufort, No. 91-2068, 1993 U.S. App. LEXIS 15166, at *16 (4th Cir. June 22, 1993) ("An employee's continuous employment is evidence of an implied agreement with the pay system of the employer . . . . [W]e will not allow employees merely to grumble about the compensation scheme and then later spring a surprise attack on an employer who has tried to comply with the options that the FLSA provides."); Monahan v. County of Chesterfield, 95 F.3d 1263, 1279 (4th Cir. 1996) (holding that firefighters were properly paid a salary to which they implicitly agreed pursuant to their continued and repeated acceptance of their paychecks without objection to the pay arrangement).

In sum, the court concludes that Al-Habashy has not proffered sufficient evidence from which a reasonable jury could find that the City failed to compensate her for overtime hours. Consequently, the court will grant the City's motion for summary judgment with respect to this claim.

### Conclusion

For the reasons stated, the court will grant the motions for summary judgment filed by the DJJ and the City. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 8th day of October, 2015.

Chief United States District Judge